**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| CHIEF PETTY OFFICER<br>JAROME BELL (U.S. Navy-Ret.)<br>Virginia Beach, Virginia<br>as a natural person and a candidate for<br>the UNITED STATES CONGRESS<br><br>                                   Plaintiff,<br><br>        v.<br><br>FACEBOOK, INC.<br>A Delaware corporation<br>c/o General Counsel Jennifer G. Newstead<br>1 Hacker Way<br>Menlo Park, California, 94025<br><u>Serve</u>:  Commonwealth Service Company<br>            100 Shockoe Slip Floor 2<br>            Richmond, Virginia 23219<br><br>        and<br><br>MARK E. ZUCKERBERG<br>President and CEO of Facebook, Inc.<br>1601 Willow Road<br>Menlo Park, California 94025-1452<br><br>                                   Defendants. | **CIVIL<br>COMPLAINT**<br><br><br><br><br><br> Civil Action No.<br><br>_____<br><br><br><br><br><br>**TRIAL BY JURY<br>REQUESTED** |

## <u>COMPLAINT</u>

Plaintiff JAROME BELL (U.S. Navy, Chief Petty Officer – Retired) brings this

Complaint against FACEBOOK, Inc. ("Facebook") in the civil claims side of this Honorable

Court seeking injunctive relief, declaratory judgment relief clarifying and declaring the legal

rights and obligations of the parties to guide their future conduct, clarification of governing legal

rights and responsibilities, and monetary damages.

1

The Plaintiff sues for breach of contract, violations of the Virginia or California [1]

Deceptive Trade Practices Act, breach of the implied duty of good faith and fair dealing, for

declaratory judgment, and for deprivation of the Plaintiff's civil rights of free speech under 42

U.S.C. § 1983, under color of and flagrant abuse of a federal statute Section 230 of the

Communication Decency Act.

## I.   INTRODUCTION

Whether or not Facebook has become a public utility, *it promised to be one* in its explicit

contractual offers to users.  Pretending to be a neutral communication platform for individuals to

communicate with each other one to one, in private groups large or small, in public groups, to

designated "friends," or to the whole world, FACEBOOK, Inc. ("Facebook") is in fact seeking to

control what people may think and say.

Facebook advertises on its opening page (when not already logged in as a user):



People are not invited to (it is not advertised), and do not, join Facebook to hear what

---

[1]     Facebook's terms of service provide that California law applies, which is ultimately
worse for Facebook than Virginia law, but likely better than the laws of foreign nations.
Whereas other lawsuits have ignored the venue and choice of law provisions by rejecting
Facebook's terms of service, this lawsuit argues that those terms of service create a binding
contract which Facebook has breached, causing damages to the Plaintiff Chief Bell.

Facebook has to say.  They are explicitly invited and promised to be able to talk to one another.  Facebook is not sold as a club, but as a communication system.

No doubt if Mark Zuckerberg were to create a publication explaining his successful business accomplishments and marketing techniques or to discuss modern trends in computer system design, many people would sign up to listen to his views.  *But this is not that*.  Facebook is very conspicuously not about what Mr. Zuckerberg or anyone at Facebook has to say or think.

Facebook presents itself falsely as a neutral communications service in which users can talk to each other when recruiting users but then commits a "bait and switch" and in fact conducts itself as a Soviet telephone operator interrupting a phone call, allowing only ideas Mark Zuckerberg wants to propagate to be distributed.  This is a violation of the California Deceptive Trade Practices Act and California's Implied Duty of Good Faith and Fair Dealing.

Facebook's actual conduct is fraud and bad faith which also invalidates Facebook's ability to claim Section 230 of the Communications Decency Act of 1996, as amended (47 USC section 230).  Facebook's actions are at all times manifestly in bad faith, not in the good faith required under Section 230.  Thus by its own terms, Section 230 is not applicable to this case.

The ultimately creepy behavior of Facebook is incompatible with its promise:  To allow we the users to talk to each other just as with the telephone company.

## II.   JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction).

2.   Although Plaintiff largely sues for breach of contract, the Plaintiff and no doubt the Defendant anticipate that a federal statute, Section 230 of the Communications Decency Act of 1996, as amended, will be an important question for the Court to decide.  Therefore, the case

should be in federal court subject to appeal through the federal appellate courts. One anticipated defense will turn on interpretation of a federal question under the facts presented, even though that defense arises in response to a state-law breach of contract action.

3.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) because the amount in controversy exceeds $75,000 and there is complete diversity amongst the parties.

4.      This Court has supplemental jurisdiction over Virginia state law claims within this case pursuant to 28 U.S.C. § 1367 (for state law claim of conversion of personalty).

5.      To document diversity of parties, the Plaintiff is a citizen of the Commonwealth of Virginia in Virginia Beach, Virginia, where he permanently and exclusively resides his actual abode which he has chosen as his residence, domicile, and citizenship.

6.      For the purposes of documenting diversity of the parties, the Defendant is a corporation incorporated in the State of Delaware, with its headquarters, nerve center and nearly all operations in Menlo Park, Virginia.

7.      Facebook has submitted itself to the jurisdiction of the Commonwealth of Virginia by registering for authorization to do business in the Commonwealth of Virginia though the Virginia State Corporation Commission.

8.      On information and belief, Facebook, Inc. maintains a data center at or near 6200 Technology Blvd, Sandston, Virginia 23150, East of Richmond, and another data center in Henrico, Virginia, North of Richmond .[2]

9.      On information and belief these and perhaps other data centers in Virginia are very large, sophisticated, banks of computer data "servers" which receive, store, and retransmit

---

[2]      https://www.facebook.com/HenricoDataCenter/

unimaginably large quantities of data. [3]

10.     However, on information and belief, the data centers are not executive offices and no decision-making or leadership of the corporation occurs at Facebook's data centers.

11.     Thus, Facebook is physically present and operating in Virginia, for the purposes of *in personam* jurisdiction, but for the purposes of diversity of citizenship analysis all of Facebook's leadership, executive officers, and nerve center are in Northern California.

12.     Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3), and (e)  because the lead Plaintiff resides in the judicial district for the Newport News, Virginia region and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

13.     However, Facebook's term of service purport to require that litigation involving Facebook must be held in the forum of the U.S. District Court for the Northern District of Virginia or in California state court.

14.     Therefore, based on private agreement rather than statute or rules, venue very likely must be transferred to the U.S. District Court for the Northern District of California.

15.     However, such forum selection clause and choice of law would hang on whether or not Facebook's terms of service and other policies announced for members to respond to by joining constitute a binding, legal contract.  If there is no binding contract, then there is no forum selection clause or choice of law clause.

16.     Plaintiff, by counsel, warns against conduct of transferring the case to California and then there deciding there never was a contract that is binding.  In such case, the rest of the causes of action should be returned back to this judicial district in Virginia.

---

[3]     Governors Jim Gilmore and Bob McDonnell promoted policies and circumstances and engaged in a welcoming "charm offensive" to build a "Silicon Valley East" in Virginia

### III.    PARTIES

<u>**Plaintiff**</u>

17.    Plaintiff Chief Petty Officer Jarome Bell ("Chief Bell ") is an individual, a natural person, who at all material times was and is now a citizen of Virginia.

18.    Chief Bell is an African-American Republican candidate for the U.S. House of Representatives from Virginia Beach.

19.    Having dedicated his life to a career in the U.S. Navy, retired as a Chief Petty Officer after 27 years, Chief Bell is running for the U.S. House of Representatives to defend our republic against the foreign and domestic enemies to our Constitution, to which he swore an oath as a member of our Armed Forces — an oath that does not expire.

20.    Chief Bell argues that the Democrat party put Black votes on the back of the proverbial bus long ago, and left African-Americans like him behind. Chief Bell says "They don't represent us now, and arguably never did.  Similarly — and with the exception of Donald Trump — the establishment wing of the GOP no longer represents middle class working Americans."

21.    Chief Bell argues that "Whether they're communists, socialists, or violent protesters in the streets, the far-left has infected our government at every level with dangerous, anti-American ideas and policies, and it's time we put a stop to it.  I served with the FBI until I embarked on a life-changing course with the United States Navy, where I completed seven and a half years of sea duty and flew over 9,000 hours as a Naval Aircrewman circling the globe in support of our nation's military missions and national security interests."

22.    While in the U.S. Navy, Chief Bell deployed twice on the U.S.S. Carl Vinson under President Ronald Reagan during the Cold War and in past years as a Naval Aircrewman deployed numerous times to various countries in defense of our country abroad.  He faithfully

served world-wide on every continent except Antarctica and at times accompanied world dignitaries on diplomatic missions, including once having the privilege and honor of airlifting Dr. Condoleeza Rice to Tel Aviv, Israel for a peace summit.

23.     Since retiring from the Navy, Chief Bell opened a small business he owns and operates, Line6 Recruiting Services, where he helps young adults who will soon be graduating from high school obtain college athletic scholarships.

24.     In other words, Chief Bell is an African-American patriot whom the Democrat Party must silence and try to destroy. The entire public image and strategies of the Democrat Party depend upon stirring up racial grievance and creating a sense of dependency upon them as the party of government.

25.     Chief Bell's candidacy as a conservative, MAGA Republican presents a powerful rebuke to the racist appeals and manipulation of the Democrat Party.

26.     Therefore, Facebook has sought to silence Chief Bell as a candidate for Congress to prevent the contradiction of the Democrat Party's political messaging.

27.     Recent documentary revelations in the news have exposed that Facebook in fact colluded with Democrat Party operatives, candidates, and campaigns, including that of then candidate Joe Biden.

### Defendants

28.     Defendant FACEBOOK, Inc. is a telecommunications service business which entices private individuals to supply their own content to the Facebook community by making (and then breaking) the promise that individuals can have their own opinions, comments, and messages be heard.

29.     Facebook is not a news outlet and does not produce or disseminate any content of

its own.

30.     Facebook has no reporters, writers, or originators of its own content.

31.     Facebook relies upon the content supplied by its users as the action and reason for other users to congregate within the Facebook community.  Facebook entices members to supply the members' own content to make the Facebook platform function and succeed by promising in return the opportunity for those members to be able to post the member's own opinions and thoughts and to be heard by all other members, especially by those who have chosen to link to the member's page (designated euphemistically, but not in any normal sense, "friends").

32.     If users did not supply their own content, no one would join or participate on Facebook.  Thus, Facebook exploits and uses its members to attract other members by tricking those members into providing uncompensated content.  Members are "compensated" only by the promise that they can communicate with others and be heard without interference.

## IV.     REQUEST FOR RECONSIDERATION, MODIFICATION, OR EXTENSION OF EXISTING LAW.  SECTION 230(2)(a) OF THE COMMUNICATIONS DECENCY ACT OF 1996 IS INAPPLICABLE AND WRONGLY CONSIDERED

33.     The Plaintiff, by counsel explicitly asserts that previous interpretations of law have been conspicuously wrong, and inexcusably so, and explicitly requests that this Court and appellate courts reject inconsistent, prior misinterpretation of legal principles, statutes and precedents and correct those mistakes by applying accurate, correct legal principles and rules of statutory construction.

34.     If these legal principles must be reconsidered, the Plaintiff sues for and seeks in good faith several extensions, clarifications, and corrections of misguided legal precedents, just as exhaustively explained by U.S. Supreme Court Justice Clarence Thomas in *Biden V. Knight First Amendment Institute at Columbia University*, 593 U.S. _____ (April 5, 2021), Record No.

20-197, (Concurrence of Justice Clarence Thomas) (actually a dissent in substance) and also passionately argued by Facebook itself in a relentless, wall to wall, cable television advertising campaign appealing for laws and regulations for social media to be updated after 25 years.

35.    Section 230, in particular, has been read to say what it does not say.

36.    Regardless of past mistaken misinterpretation, the rules of statutory construction are quite clear and unyielding.

37.    Facebook's lawyers have erroneously ignored and induced some judges to flagrantly ignore the doctrine of ***Noscitur a Sociis*** (seemingly open-ended or general terms are strictly limited to the context of specific terms) ignore the plain words of the statutory preamble statement of principles, interpret the requirement of "good faith" as subjective and untethered from the narrow specifics of the statute to which "good faith" must be tightly connected, and allow subjective evaluation of Section 230(2)(A)'s elements.

38.    Section 230 begins with:

(a)FINDINGS

The Congress finds the following:

(1) The rapidly developing array of Internet and other <u>interactive computer services</u> available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3)  The Internet and other <u>interactive computer services</u> offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

* * *

39.    Thus, Section 230 must be construed as advancing the goals of the user's

(Facebook member's) control over the information he or she receives and the goals of "a true diversity of political discourse."

40.     Under the doctrine of ***Noscitur a Sociis***, the general, open-ended phrase "<u>or otherwise objectionable</u>" is strictly limited to the context of the more specific, more limited terms that it follows of material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing."

41.     Section 230(2)(A) provides no immunity to Facebook's actions unless those actions were taken in good faith to limit publication of "obscene, lewd, lascivious, filthy, excessively violent, harassing" material *or similar material of the same kind.*

42.     Section 230(2)(A) provides no immunity to Facebook's actions whatsoever if a member's posts or comments are deemed "otherwise objectionable" for reasons unrelated to being "obscene, lewd, lascivious, filthy, excessively violent, harassing."

43.     "Otherwise objectionable" could not mean, for example, a person expressing (a) his dislike of vegetarian hamburgers which Facebook staffers could perhaps decide are healthy, (b) statistics calling into question whether humans are causing climate change, (c) where the SARS-CoV-2 virus originated from, (d) that the contents of Hunter Biden's laptop are genuine, (e) that the Soviet Union was behind John F. Kennedy's assassination or (f) even that flimsy, disposable masks which were intended for medical professionals to wear for no more than a few minutes up to 90 minutes at a time and then be discarded have significant disadvantages for the general public to wear for weeks on end.

44.     "But it isn't true!" (in Facebook's flawed and often wrong opinion) does not qualify as "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."

45.     U.S. Supreme Court Justice <u>Louis D. Brandeis</u> established the "counter-speech" doctrine in his classic concurring opinion in <u>*Whitney v. California*</u> 74 U.S. 357 (1927) *(concurring opinion, J. Brandeis)*, when he warned:

> **"If there be time to expose through discussion, the falsehoods and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."**

46.     Thus the phrase "or otherwise objectionable" is not a roving commission to search out through the expanse of all of society whatever Facebook's *Philosopher Kings* may think (without much of a track record of success) would be best for the society of their lesser brethren.

47.     Neither Section 230 nor Facebook's contract with Chief Bell authorizes Facebook to censor news, information, or opinions which Facebook imagines (usually incorrectly) to be false.

48.     Even if Facebook were qualified to decide what is true or false, it is not their business to try to do so.

49.     The element of "good faith" is strictly limited to the context of Section 230(2)(A).

50.     "Good faith" in Section 230(2)(A) does not mean anything that Facebook subjectively believes might be good for society.

51.     Actions "taken in good faith" are narrowly and strictly limited to the rest of Section 230(2)(A) to restrict "obscene, lewd, lascivious, filthy, excessively violent, harassing" material.

52.     "Good faith" in Section 230(2)(A) does not mean any and all good intention in society in general.

53.     A sincere belief, defensible as not irrational to an objective observer, that a

member's post on Facebook is lewd or lascivious is one taken in good faith and subject to the immunity of Section 230(2)(A).

54.     A good faith belief (for example) that society would benefit if people abstained from eating red meat could not qualify as the "good faith" requirement under Section 230(2)(A) for Facebook to enjoy immunity, because it is untethered from the rest of the statute.

55.     A good faith belief (for example) that society would benefit if people abstained from eating red meat could not qualify as the "otherwise objectionable" term under Section 230(2)(A) for Facebook to enjoy immunity, because it is untethered from the rest of the statute.

56.     Finally, in no other context, unless explicitly called for, would statutory terms be construed without any objective component.

57.     "Good faith" for example is a term of art in the law, which does not include an irrational belief ungrounded in fact or reality, and which is limited by a sincere basis in fact.

58.     Here, Section 230 provides no immunity or hope of any defense to Facebook's bad faith actions far outside the terms of Section 230(2)(A).

## V.     GENERAL FACTS AND LAW COMMON TO ALL COUNTS

### A.  Parties Entered Into a Contract Which Facebook Breached

59.     Facebook and Chief Bell entered into a contract for telecommunications services.

60.     Facebook breached the contract.

61.     Chief Bell now sues for Facebook's breach of contract.

62.     Facebook removed at least six of Chief Bell's posts from his page for his candidacy as a candidate for election to the U.S. House of Representatives from Virginia.

63.     Chief Bell's posts were accurate and historical warnings explaining his position as a candidate for the U.S. House of Representatives on important political issues.

64. Yet Facebook blocked these posts of Chief Bell, suspended his account for various time periods of 3 days, 7 days, and 30 days, and has blocked Chief Bell's use of the "live" or video streaming function up until July 1, 2021.

65. The "live" function is of great importance during a political campaign for elected office.

66. As demonstrated by Virginia Republican candidates since the 2017 campaign for Governor, use of Facebook's "live" function is a vitally important method for candidates covering a large amount of territory in massive Virginia.

67. The "live" function allows Facebook members to easily broadcast video of campaign appearances, speeches, and commentary from anywhere on the road.

68. Thus, the loss of the "live" function is a significant harm in the short time-table of a political campaign.

69. All of these limitations had a cascading effect of reducing Chief Bell's candidacy and fund-raising, in which notoriety builds over time with growing fund-raising prospects.

70. In a political election campaign, notoriety and fund-raising should grow exponentially and quickly if the campaign is to be successful. Each effort builds on the last.

71. As a result of this disruption to Chief Bell's congressional election campaign by Facebook, his campaign lost in excess of $75,000 of fund-raising and the expenditure of greater costs to compensate for the loss of telecommunication services.

B. **CHIEF BELL'S POSTS DID NOT VIOLATE COMMUNITY STANDARDS**

72. It is important to understand that as an elected member of Congress, Chief Bell would be called upon to vote upon these political issues covered in his Facebook posts.

73. The voters of Virginia have a right to know candidate Chief Bell's position as a

likely Member of Congress on these political issues.

74. These are not random opinions or commentary but part of Chief Bell's candidacy for U.S. House of Representatives.

75. Facebook literally censored a congressional campaign for elected office.

76. Chief Bell explained to the voters of his Congressional District his position on guns, gun control, and the Second Amendment with a (historically accurate) warning from real-world history.

77. Chief Bell posted:



"Germans who wish to use firearms should join the SS or the SA. Ordinary citizens don't need guns, as having guns doesn't serve the State."

-Heinrich Himmler

78. Clearly, African-American Chief Petty Officer Jarome Bell was unmistakably warning from history the political error of contemplating gun control laws that he might be called upon to vote for or against as a Congressman in light of whether a U.S. citizen "needs" a gun and whether a citizen's constitutional rights are limited by what "serves" the state by pointing out a horrible historical precedent we should never allow to be repeated.

79. Facebook suspended Chief Bell's ability to use his page for his candidacy as a candidate

for election to the U.S. House of Representatives and his personal account, when campaigning

for elected office is a very time-sensitive process on short time-tables.



80.    Facebook knew that the account was an elected campaign for congressional

office, because the account name says so.

81.    Chief Bell explained to the voters his position on the government's response to

the COVID-19 epidemic, as important issues facing the next session of Congress and which the

voters would need to know the candidates position on when voting in November 2022:



82.      Facebook acted in bad faith, where Chief Bell asked questions:



83.   Facebook lied in "covering" this post, including because the public policy questions that need to be answered did not assert "information" and no such information was checked by fact checkers.  Chief Bell identified issues of concern for Congress in the upcoming

election for U.S. Congress in 2022.

    84.    Chief Bell posted on May 31, 2021:



    85.    Chief Bell posted on April 13, 2021:



    86.    Chief Bell posted on January 28, 2021:



87.    Which Facebook then removed and banned:



### C.  FACEBOOK'S VIOLATIONS OF THE CONTRACT

#### i.  "COMMUNITY STANDARDS" CLAUSE UNENFORCEABLE

88.     Facebook admits that it changes its "community standards" as often as once every two weeks.   https://about.fb.com/news/2019/04/insidefeed-community-standards-development-process/

89.     Thus, any requirement to abide by "community standards" is illusory, without legal meaning, and unenforceable.

90.     As an illusory promise of the contract, Facebook's "community standards" requirement is a one-way promise which is arbitrary and capricious.

91.     That is, within the concepts of contract law, the claim of a requirement of meeting "community standards" contains no standards at all, no principles, no guidelines, nothing.

92.     The requirement that posts meet these illusory, ill-defined, ever-changing "community standards" is null and void within contract law.

93.     Facebook is in effect promising to provide communication services as a neutral platform but only if they feel like it for any or no reason at all.

94.     That is no promise at all.

95.     Moreover, Facebook does not announce changes to its community standards, such that its ever-changing "community standards" cannot qualify as a condition or return promise under the contract from a member, because members are not notified of the changing standards.

96.     In fact, Facebook does not identify or explain for users its "community standards" at all, whether at the time a member joins or at any later time.

97.     Facebook offers only the vaguest of abstract aspirations with insufficient detail to inform anyone, including its own censors, of what the community standards actually are.

98.     It is legally impossible for anyone to violate Facebook's "community standards" because they are not standards at all but vague, ambiguous, superficial, idealistic, utopian outcomes – platitudes -- that Facebook wishes to have happen, such as members feeling "**safe**."[4]

99.     Facebook offers vague and ambiguous statements which are hoped-for results, not characteristics of a messages or content posted by members that is acceptable or not.

100.    Therefore, stating only outcomes such as how a person might subjectively react to a post do not create a contractually valid or enforceable obligation in a contract.

101.    It is not possible to determine if a member's posts, messages, and/or content violates these aspirational platitudes because they are not capable of being analyzed factually.

102.    Expressing a vague hope that posts might have some happy effect on others cannot impose any enforceable obligation upon the Plaintiff or others.

103.    Furthermore, no one sees a member's posts unless they have chosen to become a "friend" (not an actual friend, but a euphemistic term for contacts who are "followers" of a member's posts) or who go looking for a poster's Facebook account page (called a profile or news feed).

104.    Thus, when considering the vague, ambiguous, superficial, subjective aspirational platitudes of Facebook's "community standards" these must be placed in the context that nobody will see Chief Bell's (or anyone else's) posts on Facebook unless they are either looking for them or have chosen to designate themselves as one of his "friends" or followers.

---

[4]     One of the few categories that approaches clarity is the rule against hate speech.  But the definition of "language that attacks people" based on various characteristics clearly does not mean to Facebook "language that attacks people."  Facebook in fact uses the category of "hate speech" to include any opinion that a person of various categories might have a disagreement with, except that of course vilifying Christians, Whites, or males is always allowed on Facebook.  Thus, even standards that at first glance have the appearance of being specific actually fall apart after examination and consideration of how the term is actually applied by Facebook.  Posts that do not "attack" anyone for any reason are classified by Facebook as "hate speech."

105.    So, the relevant "community" for these "community standards" is those who like what Chief Bell has to say.

106.    Thus, the ever-changing "community standards" requirement is not contractually enforceable.

107.    For these reasons, the ever-changing "community standards" requirement violates in practice California's and Virginia's implied covenant of good faith and fair dealing by depriving Chief Bell and others of the benefit of their bargain.

108.    The ever-changing "community standards" requirement has become in Facebook's hands a magic trick which violates in practice California's and Virginia's implied covenant of good faith and fair dealing by withholding the benefits of the contract and the promised services from members like Chief Bell for unexplained, arbitrary, and capricious reasons.

### ii.   FAILURE TO PROVIDE PROMISED APPEAL RIGHTS OR IDENTIFY RULES OR STANDARDS ALLEGEDLY VIOLATED

109.    Facebook has promised Chief Bell and others the right to appeal any adverse action such as removing a post, suspending access to Facebook or the like.

110.    Facebook flagrantly violates this contractual obligation of Facebook.

111.    In limited circumstances, appearing to be somewhat random, Facebook will provide a method to challenge an adverse action, although the method is usually hidden from all but the most determined members.

112.    However, most of the time (literally a majority of the time) the function does not work, and produces an error message that the function is unavailable at this time.

113.    This would mean that even Facebook would not be notified that someone tried to

object and point out an error in their actions, because the function failed.

114.    Facebook diligently hides any contact information or means to contact them.

115.    During the COVID-19 global pandemic, working from home over the internet (really from anywhere in the world) when people were in financial need would have been a perfect solution to continue operations for Facebook functions while Facebook staff might not be gathering in its offices.

116.    Instead, acting in its continual pattern of bad faith, Facebook suspended appeals of adverse actions and second level (supervisory) reviews of adverse actions.

117.    Acting in bad faith, Facebook exploited the excuse (though in a plainly illogical excuse) of the COVID-19 pandemic to censor posts during a presidential campaign without the contractually-required opportunity to appeal the censorship.

118.    Again, Facebook could have employed Facebook employees working from home or contract employees hired to work from home, thus demonstrating the cynical and false pretextual excuse and lack of good faith.

119.    In roughly one-third of the cases when posts are removed, covered, or the basis of suspending, blocking or banning, Facebook will not identify which post it is referring to.

120.    Especially for the Administrator of a group who did not personally post the comment, but is confronted with a warning to the group Administrator, the member of group Administrator sometimes has no idea what post Facebook is accusing as being objectionable.

121.    The Administrator cannot judge or counsel a group member without knowing what the post was or why it might have been seen as objectionable.

122.    The Facebook notice says that Facebook cannot show the content of the objectionable post, suggesting that it is so horrible that even the person who originally posted it

cannot be shown the post.

123.    This of course is a breach of contract interfering with the member's right to appeal and/or enforce the terms of the contract.

124.    Interfering with the ability of the member to enforce the contract or to appeal is of course an act of bad faith, defeating Facebook's legal defenses.

125.    The failure to provide appeal / review of erroneous adverse actions is a breach of the contract.

126.    The failure to identify the reasons for adverse actions is a breach of the contract.

127.    The failure to clearly identify in advance of a member using Facebook what the community standards are is a breach of the contract.

128.    The failure to clearly identify in advance of a member using Facebook the constant changes made to community standards is a breach of the contract.

129.    Nevertheless, the intrepid and capable Chief Bell was able to fine one or two email addresses for Facebook employees.

130.    Chief Bell protested Facebook's actions by email

131.    Facebook did not respond with any decision or remedy.

### iii.  SHADOW BANNING IS A VIOLATION OF THE CONTRACT

132.    Chief Bell has also suffered the loss of the promised communication services because Facebook announces publicly that it reduces the reach or distribution of all of a member's posts, even those that are not objectionable.

133.    That is, Facebook admits publicly to violating its contract and terms of services as to member posts which are admitted to *not* be in any way objectionable because Facebook alleges that *other*, different posts violated Facebook's ambiguous, vague, aspirational platitudes.

134.    Facebook admits to denying members including Chief Bell the promised communication services as to messages, posts, and/or contents which it admits are not in themselves objectionable.

135.    Originally a term developed in the world of Twitter users, "shadow banning" has come to be a single, clear, comprehensible term for adverse action also committed by Facebook.

136.    Facebook describes the same concept alternately as "slowing" down a member's posts or limiting the reach or distribution of the member's posts.

137.    However called, it is a violation of the contract between Chief Bell and Facebook.

138.    Meanwhile, Facebook is also frightening and intimidating Administrators of conservative political groups with imminent cancellation of the entire group because of a few member's few posts which Facebook claims to violate ill-defined and unidentified community standards.

139.    Administrators of conservative groups keep warning members that they are in danger of having the group shut down, thus leading to severe censorship of political speech.

140.    However, there is nothing in Facebook's contract with Chief Bell or others which allows Facebook to censor, reduce distribution of, limit the reach of, or "slow down" Chief Bell's unobjectionable posts even if under Facebook's mysterious, subjective, and ill-defined aspirational standards a couple of his posts are disliked by Facebook.

141.    Facebook's adverse actions to reduce the reach of Chief Bell's posts which are not objectionable are actions of censorship made in bad faith.

### iv.  ADVERSE ACTIONS FOR POSTS THAT DO NOT IN FACT VIOLATE ANY COMMUNITY STANDARDS

142.    Furthermore, Chief Bell's posts do not actually violate any version, including the pretextual elastic versions asserted, of Facebook's "community standards."

143.    For example, although the records is not now showing on Facebook, the attorney Jonathon Moseley posted a news summary image or "meme" about crime statistics.

144.    Facebook immediately removed the post (or perhaps covered it) on the grounds that it was similar to other posts that had been determined to be false by independent fact checkers.

145.    On examining the link to the independent fact checker, Moseley discovered that the report of the independent fact checker *had nothing to do with* the content of Moseley's post.

146.    Other people's post contained an additional topic not found in Moseley's post.

147.    Yet, Facebook was programmed to instantly remove (or cover with a notice) Moseley's post based on what other people's post – not Moseley's – said.

148.    Facebook objected to a statement *not* included in Moseley's post.

149.    On another occasion, someone posted a message about treatments for COVID-19 in a group that Moseley controls as Administrator.

150.    Facebook provided a warning that the use of soap and water is important but not a cure for COVID-19.

151.    However, the post which Facebook covered and attached a warning to had absolutely nothing to do with that topic.  The member's post did not address or discuss the use of soap or water in any way, whether for curing or containing COVID-19.





152.    Facebook connected an independent fake fact checker article that was completely irrelevant to the post in the group "Conservative Party" on Facebook.

153.    On the rare occasions when Facebook identifies (vaguely) why a member's post violates some standard or rule, it often turns out to be an error in which the member's post does not actually contain or address the subject matter that Facebook asserts to be objectionable.

154.    Facebook is rampantly violating its contract by recklessly connecting member's posts to standards or rules which actually do not in any way relate to the post.

155.    In the case of Chief Bell, it remains mysterious why Facebook objected to about six of his posts, and therefore, it is difficult to say.

156.    But on information and belief, on discovery, it will become clear that once again

Facebook erroneously, randomly, and recklessly assigned irrelevant categories like "hate speech" that don't actually apply to Chief Bell's posts, almost like throwing darts at a dart board while wearing a blindfold.

157.    On information and belief, Facebook's reasons for removing Chief Bell's posts and restricting his use of Facebook are pretextual excuses because they do not want a conservative, African-American Republican to become a symbol opposed to the Democrat Party.

158.    On information and belief, Facebook's reasons for removing Chief Bell's posts and restricting his use of Facebook are pretextual excuses because Facebook's censors do not want a successful African-American conservative, MAGA Republican to debunk the Left's attempts to falsely smear Republicans as racist, when they are not.

### v.   CENSORSHIP OF NEWS VIOLATES THE CONTRACT

159.    Much of the difficulty is in Facebook's "Spanish Inquisition" against news reports that Mark Zuckerberg and his team do not like and do not want anyone to know about.

160.    This has led to a public relations catastrophe as the news that Facebook and others spent a year censoring are now being proven to be in fact true.

161.    However, the very enterprise of censoring news reports that disagree with Mark Zuckerberg's inaccurate, unfounded opinions is a violation of the contract between Facebook and Chief Bell as also with other members.

162.    Even if a group of Leftists gather together every two weeks and give their opinions to each other on left-wing politics in the name of Facebook's "community standards," the actual contract between Facebook and Chief Bell does not support the effort to censor news reports, information or misinformation within the contractual terms no matter what the "community standards" board tells itself.

28

163.    There is no authority within the contract for Facebook to censor opinions based on what Facebook believes is true or untrue.  (And Facebook's abysmal record on knowing what is true should have warned Facebook off of the attempts.)

164.    Facebook's contract with Chief Bell and others emphasizes the Facebook member's right to share his or her own ideas and opinions and links to various news reports.

165.    Facebook's bad faith attempt to censor "misinformation" is not part of the contract formed between Facebook and Chief Bell.

166.    This is especially inexcusable and in bad faith when Facebook surely understands by now that Facebook was the one spreading misinformation and members of Facebook was censoring were telling the truth all along.

167.    The fact that Facebook is habitually wrong about its political opinions and understanding of news and conflicting medical views should have warned Facebook by now that Facebook is not a newspaper, news media outlet, or publisher of news and that it should stay out of the news business and do what Facebook is authorized and able to do:  Provide a neutral communications service for members to talk to each other.

### *vi.* USE OF INDEPENDENT FACT CHECKERS VIOLATES CONTRACT AND IS AN ACT OF BAD FAITH

168.    Adding to Facebook's bad faith and violations of the contract, Facebook has colluded with a George Soros funded front group to invent fake fact checkers which it calls independent but which are not independent.

169.    Plaintiff here defines a fake fact checker as one that either did not actually exist prior to Facebook employing it or which hardly anyone had ever heard of before Facebook engaged them to censor political conservative speech.

170.    In any event, Facebook often − but *not* exclusively − hides behind the fake fact

checkers that on information and belief it created for the purpose.

171.    Facebook also just outright censors conservatives without hiding behind anyone.

172.    Because the purpose of hiding behind an "independent fake checker" would be to give confidence and credibility to its decisions to censor conservative political speech, the conspicuous and glaring use of groups that are unknown to the general public and which almost no one has ever heard of before demonstrate that on information and belief Facebook concocted these organizations as a contrivance.

173.    If Facebook wanted to actually rely upon credible and trusted third parties, it would not be using organizations that do not inspire any confidence among the public but instead leave the public wondering "Who are these people?"

174.    On a few occasions, Facebook will cite to the opinions (usually not  actual news articles) of left-wing but mainstream newspapers or news outlets like USA Today, Reuters, or the Associated Press.

175.    But the fact that Facebook obviously could, and knows how to, cite to mainstream newspapers or news magazines highlights the fraud of using instead fact checkers that the public will have no knowledge of and no confidence in.

176.    On information and belief, Facebook by itself and/or by collusion with other social media and George Soros funded front groups invented these fact-checking organizations purely to deceive and defraud the public and its members, acting in bad faith.

177.    On information and belief, these fact-checkers are not in any sense independent but are dependent for their funding upon George Soros and for their notoriety upon Mark Zuckerberg and were created by Mark Zuckerberg and George Soros.

178.    Plaintiff alleges that these previously-unknown, mysterious, shadowy fact

checkers know where their next meal is coming from, that it is dependent upon their role in censoring political conservatives.

### vii. FACEBOOK EMPLOYEES CENSORING MEMBERS FOLLOWING THEIR OWN INDIVIDUAL RULES

179.    On information and belief, discovery will show that Facebook's unnamed, unaccountable censors do not actually follow Facebook's promises, policies, community standards, or instructions but are allowed by Facebook management with a wink and a nod to conduct the individual censor's own individual political war against individual Facebook members, particularly those who are most effective at advancing conservative views.

180.    That is, what Facebook announces as its policies and procedures have little relationship to what Facebook actually does in actually breaching its contract with its members.

181.    On information and belief, discovery will show that Facebook's unnamed, unaccountable censors do not remove or respond to individual posts, but instead determine that they do not like a conservative member and go searching for a pretextual excuse to suspend or block conservative members whose political opinions the unnamed censors don't like.

182.    On information and belief, discovery will show that Facebook's unnamed, unaccountable censors pretextually complain about certain posts – including making strategically-motivated "mistakes" – but in reality are targeting individual members for the members' overall conservative political beliefs expressed in other posts not being flagged.

### D.  Bad Faith by Pretextual, Arbitrary, Jihad Against Conservatives

183.    For all causes of action, Facebook's actions are in bad faith and pretextual, demonstrably false, evasive excuses, which strip Facebook of all legal defenses.

184.    For example, counsel Jonathon Moseley posted on Facebook the following image:



185.    In response, Facebook blocked the image and banned Moseley, as he recalls, from using Facebook for 7 days.

186.    The image (created by someone else) portrayed Facebook staff as playing the role of Nazis, and Facebook leaped to confirm this role by in fact banning the image.

187.    A post accusing Facebook of looking for excuses to ban members like Moseley was then given as the reason for Facebook to ban Moseley.

188.    Moseley also reposted on Facebook the following image:



189.    When Moseley re-posted the above, in response, Facebook blocked the image and banned Moseley from using Facebook for 3 days.



190.    That is, drawing attention to Facebook's hypocritical behavior with a post that Facebook refused to take down from Facebook on the grounds that it did not violate community standards, was banned as a violation of community standards.

191.    Attorney Moseley posted this montage from photographs of public events:



192.    And then Facebook instantaneously (that is, pre-programmed) removed this post and blocked Moseley from using Facebook for "**nudity or sexual activity**."



193.    When attorney Moseley reposted someone else's satirical image poking fun of Facebook's obvious political bias against conservatives, Facebook confirmed its own bias:



194.    Jonathon Moseley reported many offensive posts and images from the Facebook group "PrayerWorks" (whose Administrators stopped managing it years ago).

195.   **NOTE:** The argument is <u>not</u> that posts should be banned, but that Facebook is hypocritical and acting in bad faith.  Facebook claims that political speech it doesn't like may upset some of its community.  But Facebook allows non-conservative posts that could upset at least some of the Facebook community.  Yet only conservative political messages are censored.



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH SOME PEOPLE COULD FEEL HARASSED:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**




196.    The most offensive, sexualized content are not being highlighted here, including many, many images and cartoons of nuns having sex with satan, priests, or others, holy items designed as sex toys, etc.  The examples given here are the mildest of examples.

197.    Yet, despite having these posts flagged by attorney Moseley, Facebook's censors responded that these items did not violate Facebook's community standards:

**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS,**

**EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**





**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



**FACEBOOK REFUSED TO REMOVE FROM THE GROUP "PRAYER WORKS," WHEN REPORTED BY ATTORNEY JONATHON MOSELEY, SAYING THIS DOES NOT VIOLATE THEIR COMMUNITY STANDARDS, EVEN THOUGH ITS PURPOSE IS TO BE INTENTIONALLY OFFENSIVE:**



198. ***THESE ARE NOT THE WORST OF THE SEXUALLY-GRAPHIC, BLASPHEMOUS AND INTENTIONALLY OFFENSE – INTENTIONALLY SO*** – posts that Facebook deemed not to violate its community standards.

199. And recall that Facebook officially welcomes members as young as 13 years old.

200. Many of the posts Facebook allows after protest are *designed* to be offensive. It is not whether someone might take offense. Offending people, especially religious people, is the clear purpose and intent of the posts.

201. Yet Facebook approved them as consistent with its "community standards" and refused to take them down when flagged by Moseley.

202. For these reasons, the ever-changing "community standards" requirement violates in practice California's and Virginia's Deceptive Trade Practices Acts.

203. The ever-changing "community standards" requirement has become in Facebook's hands a magic trick which violates in practice California's and Virginia's Deceptive Trade Practices Acts.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*(Breach of Contract)*

204. Plaintiffs repeat and re-allege all of the previous allegations of the entirety of this

Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

### A.  Facebook's Offer is a Contract Once Accepted

205.    Facebook admits that its "Terms of Service" at https://m.facebook.com/terms.php form a legally binding contract:

> \* \* \*
> 5. Other
>
> 1.These Terms (formerly known as the Statement of Rights and Responsibilities) make up the entire agreement between you and Facebook, Inc. regarding your use of our Products. They supersede any prior agreements.
> \* \* \*
> https://m.facebook.com/terms.php/

206.    Lawyers and judges are the best prepared to understand that contract law is much more diverse, flexible, and varied than the typical lay person knows, but far more ingrained in the habit of dealing with only formal written contracts signed by both sides and susceptible of forgetting all that they learned about the different types of contracts.

207.    Lawyers and judges know that a formal written document technically "memorializes" the contract but is not the actual contract. [5]

208.    Lawyers and judges know that a contract can be formed when one side publicizes a contractual offer and the other party accepts by his or her *actions* even without words.[6]

209.    In the Restatement of Contracts (Second) is the precedent cited of a man walking

---

[5]    *Thomson v. Canyon*, 198 Cal.App.4th 594, 129 Cal. Rptr. 3d 525 (2011) ("In January 2010, the court denied the motion finding, among other things, that the prior litigation concerned whether plaintiff could enforce an alleged oral reconveyance agreement at variance with the written purchase agreement and did not adjudicate the issue of defendants' alleged negligence in failing to memorialize the oral agreement.")

[6]    In *McAulay v. Jones*, 110 Cal.App.2d 302, 242 P.2d 650 (1952), the court held that there was acceptance of an offer (to renew and extend a lease) by the conduct of the lessor.  See, also *Fuller v. Monogram Real Estate, LLC* (Cal. App. 2011).

outside on the sidewalk next to a city corner grocery store, picking up an apple, catching the grocer's attention with a nod showing the apple, and then walking on.  Held:  Contract formed.

210.    But no expression verbal or non-verbal is required.  In what is called a unilateral contract, suppose a wealth grandfather promises his grand-son "If you refrain from the demon alcohol at least until your 25th birthday, I will give you $100,000 on your 25th birthday."  The grandson does not respond at all, verbally or non-verbally, but by his actions accepts the contractual offer by in fact refraining from alcohol at least until his 25th birthday.  A contract is formed.  [7]

211.    So it is with Facebook.  The promises made by Facebook form a binding legal contract when accepted by users who respond by signing up to be members of Facebook.

### B.  Contract with Facebook is Enforceable With Consideration

212.    It has long been held in England's and America's courts that a contract is enforceable even if real estate "Black Acre" were sold for merely payment of a peppercorn.[8]  If the parties deem the price sufficient, the courts will not second-guess their decision.

213.    The members of Facebook have made Facebook the *sixth wealthiest company in the world* in 2019 by those members joining and using Facebook.  [9]

214.    Facebook is neither a charity nor non-profit organization.

215.    Facebook is receiving benefits from persuading users in Virginia, around the United States, and around the world to sign up as members.

---

[7]     *Harris v. Time, Inc.*, 237 Cal.Rptr. 584, 191 Cal.App.3d 449 (Cal. App. 1987) ("The text of <u>Time</u>'s unopened mailer was, technically, an offer to enter into a unilateral contract: the promisor made a promise to do something (give the recipient a calculator watch) in exchange for the performance of an act by the promisee (opening the envelope).")

[8]     See, e.g., *Sfreddo v. Sfreddo*, 59 Va.App. 471, 720 S.E.2d 145 (Va. App. 2012).

[9]     "Here Are The 20 Richest Companies & Corporations In The World Today ," Money, Inc., 2019, https://moneyinc.com/richest-companies-in-the-world-in-2019/

216.    Facebook perceives a value in making promises to those who respond by signing up as members and actively using Facebook.

217.    Therefore, a binding legal contract is formed when people sign up as members of Facebook and use it in response to Facebook's promises.

218.    Therefore, the contract is supported by consideration.

### C.  FACEBOOK HAS BREACHED THE CONTRACT

219.    Plaintiff has already identified specific breaches of the contract in the allegations above, which are relied upon and incorporated by reference herein.

220.    Facebook promises to enable people to connect with each other:

> Welcome to Facebook!
>
> Facebook builds technologies and services that enable people to connect with each other, build communities, and grow businesses. These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the Facebook Products or Products), except where we expressly state that separate terms (and not these) apply. These Products are provided to you by Facebook, Inc.
>
> https://m.facebook.com/terms.php/

221.    Facebook promises to Empower members to express themselves and communicate about what matters to them:

> 1. The services we provide
>
> Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you:
>
>        * * *
>
> Empower you to express yourself and communicate about what matters to you:
>
> There are many ways to express yourself on Facebook and to

communicate with friends, family, and others about what matters to you - for example, sharing status updates, photos, videos, and stories across the Facebook Products you use, sending messages to a friend or several people, creating events or groups, or adding content to your profile. We have also developed, and continue to explore, new ways for people to use technology, such as augmented reality and 360 video to create and share more expressive and engaging content on Facebook.

https://m.facebook.com/terms.php/

222.    Facebook further promises as part of its contract with Chief Bell and others:

INTRODUCTION

Every day, people use Facebook to share their experiences, connect with friends and family, and build communities. We are a service for more than two billion people to freely express themselves across countries and cultures and in dozens of languages.

We recognize how important it is for Facebook to be a place where people feel empowered to communicate, and we take seriously our role in keeping abuse off our service. That's why we've developed a set of Community Standards that outline what is and is not allowed on Facebook. Our policies are based on feedback from our community and the advice of experts in fields such as technology, public safety and human rights. To ensure that everyone's voice is valued, we take great care to craft policies that are inclusive of different views and beliefs, in particular those of people and communities that might otherwise be overlooked or marginalized.

https://m.facebook.com/terms.php/

223.    Facebook has breached its contract with Chief Bell and others and does not in fact deliver communication services for members "to freely express themselves across countries and cultures and in dozens of languages," but systematically censors conservative political messages by Chief Bell and others.

224.    Facebook has breached its contract with Chief Bell and others and does not in fact provide its communication services delivered in a way to "ensure that everyone's voice is valued" but systematically censors conservative political messages by Chief Bell and others.

225.    Facebook has breached its contract with Chief Bell and others and does not in fact "craft policies that are inclusive of different views and beliefs," but systematically censors conservative political messages by Chief Bell and others.

226.    Facebook also promises members including Chief Bell as part of its contract:

### REITERATING OUR COMMITMENT TO VOICE

The goal of our Community Standards has always been to create a place for expression and give people a voice. This has not and will not change. Building community and bringing the world closer together depends on people's ability to share diverse views, experiences, ideas and information. We want people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable. In some cases, we allow content for public awareness which would otherwise go against our Community Standards – if it is newsworthy and in the public interest. We do this only after weighing the public interest value against the risk of harm and we look to international human rights standards, as reflected in our Corporate Human Rights Policy, to make these judgments. As such, we consider the newsworthiness of content posted by anyone, including news organizations and individual users. For example, we have allowed content that graphically depicts war or the consequences of war where it is important to public discourse.

Our commitment to expression is paramount, but we recognize the internet creates new and increased opportunities for abuse. For these reasons, when we limit expression, we do it in service of one or more of the following values:

Authenticity: We want to make sure the content people are seeing on Facebook is authentic. We believe that authenticity creates a better environment for sharing, and that's why we don't want people using Facebook to misrepresent who they are or what they're doing.

Safety: We are committed to making Facebook a safe place. Expression that threatens people has the potential to intimidate, exclude or silence others and isn't allowed on Facebook.

Privacy: We are committed to protecting personal privacy and information. Privacy gives people the freedom to be themselves, and to choose how and when to share on Facebook and to connect more easily.

https://m.facebook.com/communitystandards/

227.    Facebook breached its contract with Chief Bell including by removing his warnings from history and arguments about the Second Amendment as a candidate for Congress whom would be called upon to vote on such matters if elected to Congress.

228.    Facebook breached its contract with Chief Bell including by removing his questions about the public health responses to COVID-19 as a candidate for Congress whom would be called upon to vote on such matters if elected to Congress.

229.    Facebook breached its contract with Chief Bell including by removing his questions about conflicts of interest by civil servant Dr. Anthony Fauci as a candidate for Congress whom would be called upon to vote on such matters if elected to Congress.

230.    Facebook has breached this contractual promise and does _not_ in fact "create a place for expression and give people a voice."

231.    Facebook has breached this contractual promise and does _not_ in fact fulfill its promise that "This has not and will not change."

232.    Facebook has breached this contractual promise and does _not_ in fact implement its contractual promise of "Building community and bringing the world closer together [which] depends on people's ability to share diverse views, experiences, ideas and information.

233.    Facebook has breached this contractual promise and does _not_ in fact allow "people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable."

234.    Facebook has rendered its community standards requirements unenforceable with self-contradiction such as "In some cases, we allow content for public awareness which would otherwise go against our Community Standards – if it is newsworthy and in the public interest."

Facebook has provided no standards or guidelines to define what "some cases" might be.

235.    Chief Bell has no way of knowing *in advance* if his posts as a candidate would qualify as one of those "some cases" that would be "newsworthy and in the public interest."

236.    Facebook has breached its contract by attempting to transform its community standard that "Expression that threatens people has the potential to intimidate, exclude or silence others and isn't allowed on Facebook" from a prohibition of ***actual physical threats*** into "a heckler's veto" of speech someone disagrees with as an "expression that threatens."

237.    On the contrary, it is Facebook's actions themselves which "intimidate, exclude or silence others" with the chilling effect of unclear, inconsistently-applied "standards."

238.    Facebook has breached its contractual promise:  "As such, we consider the newsworthiness of content posted by anyone, including news organizations and individuals users."

239.    Facebook does not in fact consider the newsworthiness of content including from a Congressional candidate laying out his agenda and platform.

240.    Although it would still be abusive, Facebook could actually ***label*** those "some cases" which Facebook is displaying on account of being newsworthy so that people would understand the context of the post.

241.    Facebook could actually ***label*** display of those "some cases" which Facebook is displaying as being the political platform of a candidate for elected office and thus newsworthy.

242.    Facebook has promised to make its rules clear:

> 4. Disputes
> We try to provide clear rules so that we can limit or hopefully avoid disputes between you and us.
> https://m.facebook.com/terms.php/

243.    Facebook further promises its members:

> If we remove content that you have shared in violation of our Community Standards, we'll let you know and explain any options you have to request another review, unless you seriously or repeatedly violate these Terms or if doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

> https://m.facebook.com/terms.php/

244.    As explained above and as alleged here, Facebook's "rules" such as community standards are completely mysterious, vague, ambiguous, and unclear.

245.    Facebook does not, in fact, try nor succeed to provide clear rules.

246.    Facebook intentionally, knowingly, and willfully attempts to use vague, vacuous platitudes to evade accountability and engage in arbitrary and capricious whim so that it can censor speech with which Facebook employees disagree.

247.    Facebook also promised:

> * * *
> Where we take such action we'll let you know and explain any options you have to request a review, …
>
> You can learn more about what you can do if your account has been disabled and how to contact us if you think we have disabled your account by mistake.
> * * *
> https://m.facebook.com/terms.php/

248.    Facebook breached its contract by not informing Chief Bell or others of why his account was disabled, what community standards or rules Facebook contends were violated, in what way any community standards were violated by his posts, or how to contact Facebook about it or bring a mistake to Facebook's attention.

249.    Facebook prevents members from being able to draw mistakes to its attention, thus breaching its contractual promise to Chief Bell and others.

250.    Facebook further promises its members in its contract with Chief Bell:

* * *

Unless otherwise required by law, we will notify you before we make changes to these Terms and give you an opportunity to review them before they go into effect. Once any updated Terms are in effect, you will be bound by them if you continue to use our Products.

* * *

https://m.facebook.com/terms.php/

251.    Facebook has breached its contract with Chief Bell and others and does not in fact notify Chief Bell of its fluid, ever-changing, non-specific and subjective community standards at any time, much less when changed.  Facebook does not allow members like Chief Bell "an opportunity to review them" at any time, much less before they go into effect."

252.    Facebook has breached its contract with Chief Bell, proximately causing Chief Bell with increased costs of communication services with voters of Virginia's Second Congressional District and lost donations in fund-raising appeals.

## SECOND CAUSE OF ACTION
### *(Declaratory Judgment)*

253.    Plaintiffs repeat and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

254.    Plaintiff seeks declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure ("FRCP") and 28 U.S.C. §2201, *et seq.* to clarify Plaintiff's rights and obligations as to what he can use the communication services of Facebook for and whether Facebook can censor his speech and block his access to and use of Facebook to communicate with the voters of the Second Congressional District of Virginia and supporters nationwide.

255.    Pursuant to 28 U.S.C. § 2201, declaratory judgment under federal law is available

"In a case of actual controversy within its jurisdiction," such that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Moreover, "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*

256.    Here, there is a present controversy as to whether Facebook's admitted contract with Chief Bell enables Facebook to deny the communication services Facebook has promised to provide to Chief Bell without identifying what standard or rule Chief Bell has violated and identifying in what way his posts violated any standard or rule.

257.    Here, there is a present controversy as to whether Facebook's admitted contract with Chief Bell enables Facebook to deny the communication services Facebook has promised to provide to Chief Bell without providing a right of appeal of mistaken denials in a manner that actually functions and informing Chief Bell of to whom and how Chief Bell may lodge an appeal.

258.    Here, there is a present controversy as to whether Facebook's admitted contract with Chief Bell enables Facebook to deny the communication services Facebook has promised to provide to Chief Bell by alleging that Chief Bell's posts violated vague, non-specific, subjective, aspirational "community standards."

259.    Here, there is a present controversy as to whether Facebook's "community standards" are unenforceable as part of its contract with Chief Bell because they are vague, ambiguous, subjective, and superficial platitudes which focus on aspirational outcomes rather than actual standards that a user can follow.

260.    Here, there is a present controversy as to whether Facebook's "community

standards" are unenforceable as part of its contract with Chief Bell because they are constantly changing, without notice to Facebook's members.

261.    Here, there is a present controversy as to whether federal statute Section 230 of the Communication Decency Act provides Facebook with immunity from suit when Facebook has acted in manifest bad faith.

262.    Here, there is a present controversy as to whether Section 230 of the Communication Decency Act provides Facebook with immunity from suit for breach of contract.

263.    Here, there is a present controversy as to whether Section 230 of the Communication Decency Act provides Facebook with immunity from suit for denial of service outside the terms of Section 230, as set forth in detail in Section IV of this Complaint, *infra.*

## THIRD CAUSE OF ACTION
### *Deceptive Trade Practices Act*

264.    Plaintiffs repeat and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

265.    For the reasons set forth in detail above, and by the actions of Facebook alleged above, Facebook has misrepresented its offered services, engaging in a "bait and switch" deceptive trade practice.

266.    Services are covered by the Deceptive Trade Practices Act.

267.    For the reasons identified above in detail, Facebook has deceptively misrepresented the services that it advertised and offered to the public and in fact denied those services and did not deliver the services promised for all of the many reasons identified above.

### FOURTH CAUSE OF ACTION
*Breach of Implied Covenant of Good Faith and Fair Dealing*

268.     Plaintiffs repeat and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

269.     For both California's and Virginia's Implied Covenant of Good Faith and Fair Dealing, this duty is a term implied into every contract.

270.     Therefore, the breach of the duty is a form of standard breach of contract.

271.     However, California precedents in particular appear to treat a cause of action under the covenant as at least potentially a separate cause of action from breach of contract.

272.     Here, as alleged in detail above, Facebook breached the implied covenant by multiple acts of bad faith serving to frustrate, degrade, and undermine the benefit of the bargain for Chief Bell and others from the contract.

273.     By depriving Chief Bell in bad faith of the promised services, Facebook has breached the implied covenant and deprived Chief Bell of much of the value contracted for.

### FIFTH CAUSE OF ACTION
*Deprivation of Civil Rights under 42 U.S.C. 1983*
*(First Amendment Right to Free Speech)*

274.     Plaintiffs repeat and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

275.     Unlike private companies, Facebook purports to be acting pursuant to a federal statute, Section 230 of the Communication Decency Act.

276.     42 U.S.C. 1981 requires that:

                    * * *

(c)Protection against impairment

The rights protected by this section are protected against impairment *by nongovernmental* **discrimination and impairment under color of State law.**

*(Emphases added.)*

277.    Thus, defendants who are not themselves governments or government actors are subject to 42 U.S.C. 1983, if they are acting under the color of law.

278.    The U.S. Department of Justice's guidance "Deprivation of Rights Under Color of Law," https://www.justice.gov/crt/deprivation-rights-under-color-law, clarifies that acting under color of federal law is also included within the provision of 42 U.S.C. 1981(c).

279.    Here, although Facebook is a private company, it is depriving U.S. citizens of the right of free expression as "nongovernmental" discrimination or impairment of Chief Bell's constitutional and civil rights "under color of" federal law.

280.    Acting under color of law, Facebook has deprived Chief Bell of his rights of free speech guaranteed under the U.S. Constitution in violation of 42. U.S.C. 1983.

281.    Furthermore, acting under color of law, Facebook has retaliated against Chief Bell for his exercise of his rights of free speech guaranteed under the U.S. Constitution in violation of 42. U.S.C. 1983.

282.    A violation of constitutional rights even for brief periods is redressable. *See, e.g., Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009).

283.    Facebook has proximately caused constitutional and financial harm to Chief Bell by – acting under a federal statute – depriving Chief Bell of his rights of free expression.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff Chief Bell respectfully requests that the Court issue an injunction against the Defendant from depriving him as a candidate for Congress of his ability to

communicate with the voters of Virginia's Second Congressional District and others nationwide, issue a declaratory judgment construing Section 230 of the Communications Decency Act and the rights and obligations of the parties under their contract, and award him such damages as he will prove to have suffered, and for such other relief as the Court deems proper.

## <u>DEMAND FOR JURY TRIAL</u>

**Plaintiffs demand a trial by jury on all counts as to all issues so triable.**

Dated:  July 12, 2021                    Respectfully submitted,

_____
JONATHON A. MOSELEY, Esq.
Virginia State Bar No. 41058
<u>Mailing Address Only:</u>
3823 Wagon Wheel Lane
Woodbridge, Virginia 22192
Telephone: (703) 656-1230
Facsimile:  (703) 997-0937
Email:  Contact@Jonmoseley.com